Raymond WEST et al., Appellants,

v.

Sara Cox KECKLEY et al., Appellees.

Court of Appeals of Kentucky.

Oct. 8, 1971.

As Modified on Denial of Rehearing Dec. 17, 1971.

Earle M. Nichols, Nichols & Nichols, Madisonville, for appellants.

Laurence T. Gordon, Franklin & Gordon, Madisonville, for appellees.

PALMORE, Judge.

The judgment from which the appeal is taken in this case awards Sara Cox Keckley and Annah Cox Dickinson compensatory and punitive damages against Raymond West, Vinise Menser and Billy Cartwright for the wrongful cutting and removal of certain timber, cf. KRS 364.130(1), and settles a boundary dispute in favor of Mrs. Keckley and Mrs. Dickinson. Our conclusion is that it must be reversed for the reason that the evidence has insufficient probative value to support the chancellor's finding with respect to the correct location of the line in question. A factual determination not supported by substantial evidence is "clearly erroneous" within the meaning of CR 52.01. Yates v. Wilson, Ky., 339 S.W.2d 458, 464 (1960).

The facts out of which the controversy arose are both unusual and interesting but are not necessary to a discussion of the critical issue.

Mrs. Keckley and Mrs. Dickinson own a tract of land in Hopkins County which was purchased by their late father, William J. Cox, from Ella White in 1916. Though William J. Cox owned other adjacent lands it will serve our purpose to refer to this property bought from Ella White in 1916 as the Cox tract.

The Cox tract is bounded on the east by the Orton and Bivins tracts, and it is this division line that is in dispute. Both Cox and Orton are bounded on the north by an old military line. The northeast corner of Cox is the northwest corner of Orton, and the precise location of this corner is the vital issue. As of the time the timber in question was cut West had purchased the Orton tract and had sold the timber on it to Menser, who did the cutting.

The Cox tract was patented to Lewis F. Ashby on March 6, 1858. The patent called

for 200 acres on Otter Creek described as follows:

> Beginning at a stake in the original line R. D. Howells corner; Running S 35 E 160 poles with the meanders of the branch to a stake at the mouth of the same, corner to R. D. Howells, thence with the meanders of the creek to a burr oak and black oak on the bank of the same, thence N 35 W 160 poles to a stake in the original line, thence with said line S 55 W 200 poles to the beginning.

The Orton tract was patented to Prather Ashby on June 22, 1859. The patent called for 50 acres on Otter Creek described as follows:

> Beginning at a black oak corner to Lucius Ashby. Running S 55 W with Joseph Crofton line 100 poles to Lewis F. Ashby's corner, thence with his line S 35 E 80 poles to 3 sweet gums in said line, thence N 55 E 100 poles to a stake in Lucius Ashby's line, thence N 35 W with said line 80 poles to the beginning.

The latest conveyance in the Orton chain of title, under which West obtained ownership, uses the same description.

The record does not contain a copy of the patent issued on the Bivins tract, but the latest conveyance uses a description that must have originated more or less contemporaneously with the Lewis Ashby and Prather Ashby surveys and is as follows:

> Beginning at a hickory stump on the bank of Otter Creek corner to Lucian [sic] Ashby's line; thence with his line N 33 W 112 poles to a sweet gum, hickory and mulberry on bank of north fork of Otter Creek, corner to Prather Ashby; thence with his line S 57 W 107 poles to three sweet gums, his corner in Louis [sic] Ashby's line; thence with same S 33 E 102 poles to a burr oak corner to said Ashby on bank of south fork or Otter Creek; thence down said creek with its meanders to the beginning, containing 80 acres, more or less.

From these descriptions it may be seen that there is no question of overlapping patents. According to the original surveys Cox is bounded on the west by a branch of Otter Creek, on the south by Otter Creek, and on the north and east by straight lines of 200 poles and 160 poles, respectively. Orton is bounded by straight lines of 100 poles on the north and south and 80 poles on the east and west. Bivins is bounded by Otter Creek on the south and by straight lines of 112 poles on the east, 107 poles on the north, and 102 poles on the west. Although the distances specified in the Bivins description are somewhat out of kilter with those of Cox and Orton, the landmarks mentioned in the three surveys, especially the burr oak at the Cox southeast (Bivins southwest) corner and the three sweet gums at the Orton southwest (Bivins northwest) corner, clearly established the common line of demarcation between Cox on the west and Orton and Bivins on the east.

When Cox made his purchase from Ella White in 1916 he had the property surveyed by a local surveyor and land lawyer named Jonson, who is now deceased. The description used in the deed from White to Cox was taken from the Jonson survey and, omitting the numerous calls along creek meanders, was as follows (emphasis ours):

> Beginning at a stake in the center of Back Creek with an ash pointer and running thence N 57¼ E passing J. M. Brady's corner at 20.56 poles and Ed Turley's southwest corner at 129.56 poles and Owen Blue's southwest corner at 201.2 poles, *in all 231.74 poles* to a stake with small ash and sweet gum pointers, *Rawleigh Orton's northwest corner;* thence with his line S 31–55 E *passing his southeast corner at 80.75 poles* in all 157.77 poles to a stake in the center of the northmost channel of Otter Creek; thence up said creek with its meanders (here follow 31 calls along Otter Creek) to a stake in the center of Otter Creek opposite the mouth of Back Creek; thence up Back Creek with its meanders

(here follow 24 calls along Back Creek) to the beginning, *containing 241.28 acres* more or less.

This description begins, as did the 1858 survey, at the northwest corner but runs clockwise whereas the original description ran counterclockwise. Except for the two creeks none of the original landmarks is mentioned. Presumably the burr oak and black oak at the southeast corner and the three sweet gums at the Cox-Bivins corner were gone or could not be identified.

There is no evidence that Orton or the then owners of the Bivins tract participated in or were aware of the Jonson survey. Except for a small area in the middle of the Cox tract, all of the land in this area south of the old military line which forms the north boundary was then, and continued to be until the time this controversy arose, a dense jungle of heavy timber and undergrowth, subject to frequent flooding by the waters of Otter Creek. The little area in the middle of the Cox tract was cleared in 1936 or 1937 and cultivated until 1943, but no one lived on the Cox tract and there was never any other possession of such character as alone and of itself could have ripened into title by adverse possession. And so far as we can tell from the record the same can be said with respect to the Orton and Bivins tracts. Above all, it should be noted that in the absence of established monuments and landmarks to locate the east boundary of the Cox tract in 1916 there was no way to fix it except by surveying the original patent description or descriptions on the ground.

The distance from Otter Creek to the northeast corner we can well understand because, although Otter Creek may have changed course between 1858 and 1916, at least in 1916 both it and the military line could be definitely located. So could the beginning point, where Back Creek intersected the military line at the northwest corner of the survey. But we can find in the evidence no basis for a distance of 231 poles on the north boundary except for the fact that Jonson so established it. It may be judicially noticed, of course, that the old patent surveys were often inaccurate, but so are private surveys, such as Jonson's. Without a definite monument or landmark to support it, Jonson's measurements, made at Cox's behest, are self-serving and hoist by their own bootstraps. When all the evidence in the case is carefully studied and weighed, it supports no more than a conclusion that Jonson put the line where the appellees contend it is, but there is nothing of substance to show why he did so—that is to say, why Jonson measured off 231 poles instead of the 200 poles called for by the patent and thus came out with 241 acres whereas the patent called for 200. The land in dispute lies within this deviation of 31 poles and 41 acres.

Without considering the defensive evidence with respect to the location of the line in question we summarize the testimony for appellees as follows:

*Paul Jones*, a civil engineer, had been employed to survey the Cox tract in 1942. He had his notes from that survey, but for some reason instead of introducing his own plat he introduced one he had copied from an original survey made by one J. V. Poole in about 1920 for the Otter Creek Drainage District. The inference is that his 1942 survey conformed to the Poole plat. He used "some deed calls, and then some of the owners were there and pointed out some of the corners." Since that time, in 1966, an employe of Jones named Inglis had made another survey for the appellees in which the northeast corner was "re-established" and an iron post put in place. Jones himself was present when this was done. At the same time John Donan was surveying the Orton tract, and the two crews joined in running the Cox-Orton line, having agreed on the corner. (Testifying later for the defendants, Donan's surveyor explained that he at first accepted Jones' iron stake as the corner but later changed his mind after further research.) On cross-examination Jones said that in 1942 he ran only

the north and east lines, and he identified the interested parties then present as Ruby Jackson (the appellees' land manager), Marvin Blue and Jake Crowley (the latter two being the owners of adjacent lands on the north boundary). There were no markings along the north line except for the remains of an old wire fence on that portion bounded by the Turley property, which extended eastwardly to a point in the north line of Cox which is the southeast corner of Turley and the southwest corner of Blue. Jones made hack marks along the lines surveyed in 1942, but in 1966 the timber had been cut at the east end of the property and the trees marking the east line were gone. Therefore, in the 1966 survey the northeast corner was re-established by measuring from the Turley-Blue corner. Jones said the north and east lines as thus surveyed and as shown on the Poole plat fit with the actual physical features on the ground and as shown by an aerial photograph. (He did not say what these "physical features" were, and it should be borne in mind that there actually were no distinguishing physical features by which the Cox-Orton line through the swampy woods could be identified either on the ground or by observation of an aerial photograph.) One other thing Jones said which should be mentioned is that when he surveyed the Cox north and east lines in 1942 he found a stone about 100 feet north of Otter Creek. It had no markings and he could not remember its size, "but one of the fellows that was there pointed the stone out to us as being a corner, and we came right down to the stone."

Looking back over the testimony of Jones, we point out these salient facts to be kept in mind as the other testimony is reviewed: (1) If Jones was using the White-Cox deed in making his survey in 1942, as would seem virtually certain, its accuracy as against Orton would rise to no greater dignity than the self-serving 1916 survey made for Cox by Jonson. (2) As in the instance of the 1916 Jonson survey, no one representing Orton was present during the 1942 Jones survey. (3) The Poole plat is competent evidence only to the extent that Jones says it conforms to the lines he surveyed in 1942, but even if it were competent in toto, again it would seem most probable that the Cox tract had been surveyed by Poole from the 1916 Jonson survey as described in Cox's deed from Mrs. White. Thus far, then, the accuracy of Jonson's 1916 survey remains indispensable to the factual conclusion reached by the chancellor with respect to the Cox-Orton line.

*Oda Inglis,* a civil engineer, was an employe of Jones in 1966 when the north and east lines were re-surveyed and the Cox northeast corner was "re-established." He did not himself do any of the surveying, but prepared a display of maps and plats from research work (principally from deed descriptions). He introduced an exhibit consisting of an aerial photograph with three transparent overlays showing the Cox property according to the 1916 Jonson survey and the original patent survey and the Orton and Bivins tracts according to the descriptions as we have heretofore set them forth in this opinion. The overlays are so placed that the Orton and Bivins west lines coincide with the Cox east line as platted according to the 1916 Jonson survey. Inglis ties them together by the burr oak and three sweet gums mentioned in the original survey of the Cox tract and as the southwest corner of Orton and northwest corner of Bivins in these descriptions, but overlooks the fact that these trees do not appear in the 1916 Jonson survey. And, of course, placing the overlays so that the east line of Cox is at the same place on all three results in a substantial discrepancy in the location of Back Creek as between the original patent and the 1916 description. Recalled later for further testimony, Inglis explained the difference in acreage as having resulted from Jonson's surveying the actual courses and distances along Back and Otter Creeks and gave his opinion that the property as described in both surveys was the same.

Reviewing the testimony of Inglis, it should be recognized that while a detailed survey of the creek meanders might very well have produced a different acreage from the original survey, it would not account for increasing the north line from 200 poles to 231 poles unless it can be related to some mark or monument which forces that result, and, as may be seen thus far, there is no evidence that Jonson found such a mark.

The location of the old military line which is the north boundary of Cox and Orton is clearly disclosed on the aerial photograph by virtue of the fact that some of the adjoining tracts on its north side have been cleared and cultivated. In like manner the photograph shows where the north-south boundaries of several of these tracts intersect the military line. However, it shows nothing south of the military line from which an observer could discern either the Cox-Orton line or the east line of Orton and Bivins, which means simply that no matter where the east line of Cox is platted the Orton and Bivins tracts can be platted next to it without showing any overlap or incongruity when placed against the aerial photograph. Indeed, it seems to us that there is nothing in the perimeter descriptions of these tracts that would prevent a mapmaker's sliding Orton and Bivins as far east or west as he needed to go in order to accommodate whatever east-west dimension Cox's description called for, because the east and west lines of Orton and Bivins cannot be distinguished on the aerial photograph and are not tied to any original mark or monument still in existence.

So at the end of the Inglis testimony there remains no support for the east boundary of Cox as established by the 1916 Jonson survey and the judgment of the chancellor in this case.

We come now to the lay witnesses, still looking for something of substance to support Jonson's deviation in 1916 from the dimensions set out in the original patent.

*Marvin Blue,* 71 years of age, helped with the Jonson survey in 1916, when he was about 15 years of age. He now lives some 4½ miles from the area under discussion. He recalls that in 1916 they first looked for Orton's northeast corner and, taking the calls from Orton's deed, then measured back along the north line to establish Cox's corner (Orton's northwest corner). The timber had been cut from the Cox tract some years before, and they were able to detect the dividing line from the difference in size of the growing trees. The survey proceeded southward to Otter Creek, thence up Otter Creek to Back Creek, and thence up Back Creek to Brady (the beginning point of Jonson's 1916 description). Then they checked back around the entire perimeter. At this time the property adjoining the Cox tract on the north at its northeast corner was owned by the witness's father, Owen Blue. It lay immediately to the east of the Turley tract we have heretofore mentioned.

Blue says that in 1916 the north and east lines of the Cox tract were heavily timbered and that it was necessary to cut a path with axes so the surveyor could see where he was going. There was a tree at the place they determined to be the Cox-Orton corner, but it is gone now. It was at the same place the iron post mentioned by Jones was placed in 1966. Since 1916 the witness has not consciously walked down the Cox-Orton line.

Marvin Blue testified again in the course of what the chancellor permitted to be introduced as rebuttal evidence, and in both appearances he mentioned a circumstance that comports with our solution of this case. Running from west to east, the tracts bordering the old military line on the north at and near the Cox-Orton corner may be designated, respectively, as the Turley, Owen Blue, H. L. Blue, and Brooks tracts, and the land adjoining Orton on the east as the Nelson tract. The Turley, Blue and Brooks tracts extend northward to the Slaughters-Jewell City Road, which we shall refer to as Highway 138. Access

roads run southward from Highway 138 between some of these tracts toward the Cox and Orton tracts. One of them is an old county road between the H. L. Blue and Brooks tracts which crossed the military line and, according to this witness, ran for some distance *down the east line of Orton* before angling off in a southwesterly direction. He said further that the southeast corner of the H. L. Blue tract and the northeast corner of the Orton tract coincide, and that Orton joins H. L. Blue but does not join Brooks. This testimony is of importance because the course of this road along the line dividing the H. L. Blue and Brooks tracts is clearly established and, if its southward extension represents Orton's east line, as the witness said it does, Cox's north line cannot be 231 poles long without reducing Orton's north line from 100 poles to something less than 80 poles.

Before passing to the next witness, it is of interest to note that the plat introduced by Jones shows the old road as Orton's east boundary. During the course of the trial (between depositions) Marvin Blue accompanied L. B. Blue (whose testimony is summarized below) for the purpose of measuring the distance from this road to the iron post and, as we shall see from L. B. Blue's testimony, by use of a steel measuring tape they found the distance to be 19 chains and 50 links (78 poles).

*Herman L. Blue* (brother of Owen Blue), 85 years of age, resides on Highway 138 and owns the H. L. Blue tract heretofore mentioned. He has lived in the neighborhood all his life and helped carry the chain for the Jonson survey in 1916. He says Jonson started the survey at Turley's corner, ran eastward until he located the old road on the east side of Orton, then measured back to Orton's northwest corner (which should be Cox's northeast corner), and proceeded thence to Otter Creek. On the next day Jonson measured westward from the Turley corner. At that time Cox also owned the adjoining property to the west of Back Creek. Orton lived next door

to Blue on Highway 138, and no one ever lived on the Orton tract involved in this case. Our Orton tract was bounded on the east by a road.

*Ruby Jackson* was for many years Cox's agent in charge of several farms. In 1942 he had Jones survey the north and east lines of the tract we are calling the Cox tract. They saw occasional hack marks and made new hack marks and red paint marks. On a recent visit to the area he saw that a tree with red paint marking was among those which had recently been cut down.

*Morton Henshaw*, current land manager for the various Cox properties, testified as to walking the lines and observing hack marks and paint on the trees. This, of couse, was recent and is of no value in determining whether the lines had theretofore been correctly marked.

*Lynn B. Blue* is a farmer who has lived in the vicinity all his life. He did not give his age, but obviously is a man of considerable vintage, as he lived on one of Cox's farms (not the tract under discussion) for 27 years until 1962 and said he knew the land at the time of the Jonson survey. (There may be some confusion on this point, in that the witness said he lived on the Cox farm "right there where they was surveying" and then identified the place to which he was referring as Cox's "Whitsell tract" three miles away, on which he resided for the 27 years ending in 1962. Cox then owned some 1100 acres of land.)

L. B. Blue further testified that he was familiar with the Cox-Orton dividing line and while hunting in the area had seen the corner tree with red paint marking. He identified it as a red oak 12 inches in diameter and said he understood it had been marked by Ruby Jackson and a surveyor. At one point in his testimony he said he had known this point as Cox's northeast corner for 25 years; at another, that he had known it "ever since I was a kid." Significantly, however, he added that this corner also was the *southeast corner of Herman Blue*, whereas the Cox corner as established by the judgment in this case

does not coincide with the corner of either H. L. Blue or Owen Blue, but is in the *Owen Blue* line some distance west of H. L. Blue's *southwest* corner.

As we have already indicated, L. B. Blue and Marvin Blue went out on the ground with a steel tape, measured the distance from the old road at the southeast corner of the H. L. Blue tract to the stump of the tree they regarded as the Orton northwest corner, and found it to be 19 chains and 50 links. L. B. Blue estimated that the stump (also marked by the steel post) lay about 40 yards west of the H. L. Blue southwest corner, which seems to conflict with his earlier statement that the Cox and H. L. Blue corners coincide. (He called it the *W. S.* Blue corner, but for the sake of consistency and clarity we refer to it as H. L. Blue. W. S. Blue is H. L. Blue's son and now owns the tract. The witness Marvin Blue stated that what we call the Owen Blue tract—now Branson—is one and the same as the H. L. Blue tract, but all the other evidence places two tracts between Turley and Brooks, being the Owen Blue, or Branson, tract on the west and the H. L. Blue tract on the east.)

█ We have now reached the end of what we consider to be all the evidence of any significance produced by the appellees in support of the judgment with respect to the location of the dividing line between Cox and Orton. It shows that according to the original grants (it may be assumed, we think, that the Bivins description comes from the original grant) the Cox, Orton and Bivins tracts roughly form a rectangle 300 poles long on the north side, Cox being divided from Orton and Bivins by a perpendicular *intersecting line* at 200 poles from the northwest corner and 100 poles from the northeast corner. The appellees' own witnesses make it abundantly clear that Orton's east line (or, at least, the northeast corner) is recognizable and commonly recognized in the form of a visible, identifiable landmark, an old county road. By their own witnesses they show also that the actual distance on the ground from the northwest corner (Back Creek) to this old road is 231.74 poles (Jonson's survey, later run by Jones) plus 19 chains and 50 links (L. B. Blue's measurement). This makes 309.74 poles and leaves plenty of room for both surveys to fit. Yet they contend that the dividing line is not 200 poles from Back Creek, as their patent says it is, but 231.74 poles, and that either Orton's line is farther east than the old county road or else the size of the Orton tract must be squeezed down to make room for the extra 31.74 poles claimed by Cox under his 1916 Jonson survey. We do not question that such a result is possible, but it rests entirely on the accuracy of the Jonson survey, and in our opinion there is nothing in this record to prove its accuracy except the bare fact that it was made.

Our mention of the old road as Orton's east line is not intended to suggest that the result would be any different had there been no evidence whatever with respect to Orton's boundaries, as such. We reiterate that if there were competent evidence to show that Jonson had located certain definite landmarks requiring an adjustment of the distance of the north line to 231 poles or thereabouts, then under the familiar principle that distances give way to established physical objects we could accept a finding that his survey was correct. Without such evidence, we cannot justify any distance exceeding the 200 poles called for by the Lewis Ashby patent.

█ Assuming that in 1916 Jonson marked the corner at the place where the Jones crew placed a steel post in 1966, and that some of the people in the general area (particularly the ones who helped with the survey) knew where that place was, their recognition of it as a corner necessarily rested upon the fact that it had been so marked by Jonson. One might speculate that surely at some time Jonson's markings came to the attention of the Ortons, but without a shred of evidence to that effect it cannot be assumed. It seems probable that the land was of such little value and forbidding access that no one but an occasional hunter went on it. Even if the Cox tract had been physically occupied for

a continuous period of 15 years under color of title as it was described in the deed from Ella White, it is doubtful that the mere marking of a line in the wilderness would have amounted to such open and notorious possession as to put the owner of superior title on notice that some of his property was being claimed adversely. Nor, of course, assuming that the timber on the Cox tract had been cut prior to 1916, would an act of trespass through cutting on part of the Orton tract have the effect of changing the boundary line. (This may explain the disappearance of the burr oak and three sweet gums.)

Nothing in this opinion reflects on the good faith of the appellees and their representatives. They had no reason to doubt the correctness of their 1916 deed description (and, of course, it *may be* correct—we hold only that it has not been so proved). But theirs was the burden of proof, and it has not been met.

The cause is reversed except to the extent that the supplemental judgment holds invalid the Allen quitclaim deed, with directions that a judgment be entered in conformity with this opinion, in favor of the appellants.

All concur.